347 So.2d 324 (1977)
Herman CAMPO, III
v.
William E. GEORGE and New Orleans Public Service, Inc.
No. 7895.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1977.
*325 Kronlage, Dittmann & Caswell, Albert S. Dittmann, Jr., New Orleans, for plaintiffappellant.
A. R. Christovich, Jr., New Orleans, for defendants-appellees.
Before SAMUEL, STOULIG and MORIAL, JJ.
SAMUEL, Judge.
Plaintiff instituted this suit for personal injuries and medical expenses resulting from an injury which occurred on a bus owned and operated by the corporate defendant and driven by the individual defendant. Following trial on the merits, there was judgment in favor of defendants, dismissing the suit. Plaintiff has appealed.
From our review of the record, we find the following facts:
On February 16, 1971 (during the Mardi Gras season), a bus on the St. Claude-Refinery line stopped at the corner of Canal and Rampart Streets where a group of 17 to 20 *326 youthful Negroes boarded the bus, making it standing room capacity. There were only a few white passengers. From the loud, vulgar language and topics of conversation of the group, who gathered in the back like a gang, the driver anticipated possible trouble. The group directed their remarks, boasts and threats to the white passengers.
The bus is equipped with two front and two rear blinker lights which, in the event of a disturbance, the bus drivers are directed to activate for the purpose of alerting police cars or New Orleans Public Service officials that there is trouble on the bus. The driver activated these blinkers two or three blocks after the youths boarded, but no help ever materialized.
Although the driver could not see directly to his rear because the shade was down behind him, he could see the group in his rear view mirror. The youths began to harass and intimidate the white passengers. They used profanity to everyone, asked for additional transfers from the driver, and opened the emergency door and yelled out to passing cars. Throughout the ride various passengers got off to catch another bus, saying they were getting off before trouble started.
An elderly lady was harassed because she had several packages on the seat next to her and some of the group said they wanted to sit in that seat, despite the fact that at that time there were other empty seats on the bus. An elderly gentleman came to the woman's assistance and one of the blacks spat in his face. It was a very tense situation. An armed guard, who was also a passenger and whom the group referred to as a "rent-a-pig", assisted the lady to the exit where they got off, and the driver continued on his route making various stops and pickups.
There is a police station at the corner of Poland and St. Claude Avenues, 20 feet from a bus stop. The driver made his usual stop there. At that time one of the passengers told the driver that if he were the driver this was the place he would go to seek help. The driver testified he did not seek police assistance at that time because he believed the black youths would be getting off at the Forstall Street stop which was only about 3 or 4 blocks away, and he thought that would end the problem.
After the Poland Avenue stop, one of the group asked plaintiff for a cigarette. He gave them a pack to prevent trouble, and they started to abuse him and his pregnant wife. A black punched him in the face and ran to the rear of the bus taunting plaintiff to come back and fight. Plaintiff's wife cursed the youth and the gang immediately rushed up and surrounded plaintiff and his wife. At the Forstall Street stop the group of blacks started to alight from the front and back doors until only two of the group remained at the front door. They prevented the driver from closing the door, apparently by remaining on the steps which made closing impossible, and he asked them to move on so that he could proceed on his route. Refusing to so move, the two continued to harass plaintiff. Someone threw a wooden crate in the rear door which landed somewhere near plaintiff. Then one of the two at the front door stepped off, came back in and threw a bottle which hit plaintiff on the head, causing the injuries in suit.
The applicable law is set out in Aime v. Hebert, La.App., 282 So.2d 566, 568:
"While not in the position of an insurer, a public carrier of passengers for hire is required to exercise the highest degree of vigilance, care and precaution for the safety of those it undertakes to transport and is liable for the slightest negligence. The mere showing of injury to a farepaying passenger, and his failure to reach his destination safely, establishes a prima facie case of negligence. Such a carrier can be liable for an assault by one passenger on another passenger where there is reason for the carrier employee to anticipate the assault and a failure on his part to take such action as may be practicable under the circumstances to prevent the assault from being committed or to interfere with its execution." (footnotes omitted).
*327 Aime v. Hebert, in which we decided in favor of the defendant bus company and its driver, is factually distinguishable from the instant case. In Aime the offending youths were noisy and boisterous but kept themselves in the rear of the bus and had not physically molested any of the other passengers, so that, as the Aime court concluded, the driver could not have reasonably anticipated they or any one of them would assault one of the other passengers.
In the instant case the driver could and should have reasonably anticipated the black youths would assault the plaintiff or other passengers. His passengers were aware of that distinct possibility and, by his own admission, he was aware the situation was tense and dangerous. The fact that the incident in suit did not occur until the group was leaving the bus could not have come as a complete surprise. The problem began almost four miles from where the incident finally occurred. Yet, the driver did nothing to alleviate the tension other than to put on his blinker lights despite the fact that prior to the incident the bus was stopped on Poland Avenue only 20 feet from a police station. Accordingly, we hold the defendants have failed to carry their burden of showing freedom from any negligence which caused or contributed to plaintiff's injury.[1]
Regarding damages, immediately after the incident plaintiff was taken to St. Claude General Hospital where he was given first aid and a tetanus shot. A wound caused by the heel of the bottle could not be stitched because it was in the area of the upper forehead and scalp. The following evening he was incoherent and in severe pain and was taken to Veterans Hospital. A month after the incident he was seen by Dr. David Wyatt Aiken. The doctor diagnosed plaintiff's injuries as laceration of the frontal region of the scalp, probably with mild cerebral concussion, tinnitus and dizziness, and mild cervicodorsal sprain. He was examined May 10 and June 14, and on the latter date he was referred to the New Orleans Speech & Hearing Center. On July 24, he again complained to Dr. Aiken of pain in the ear. On September 21, he was discharged. The ear pain or tinnitus had cleared two weeks previously and the semicircular scar caused by the bottom of the bottle was nontender and completely covered by hair.
We are of the opinion plaintiff is entitled to recover $115 for the medical bills and $3,500 for his pain and suffering resulting from the injury.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment in favor of Herman Campo, III, and against defendants, William E. George and New Orleans Public Service, Inc., in solido, in the full sum of $3,615.
REVERSED.
NOTES
[1] See Wise v. Prescott, 244 La. 157, 151 So.2d 356; Gross v. Teche Lines, Inc., 207 La. 354, 21 So.2d 378; Vaughn v. New Orleans Public Service, Inc., La.App., 314 So.2d 545.